Approved: _____
ANDREW C. ADAMS/FRANK J. BALSAMELLO/ANDREW DISTRICT FILED COURT
Assistant United States Attorneys

DEC 05 2017

DS
S.D. OF N.Y.

Before:    THE HONORABLE JAMES L. COTT
United States Magistrate Judge
Southern District of New York

- - - - - - - - - - - - - - - - - x
                                  :
UNITED STATES OF AMERICA          :    **COMPLAINT**
                                  :
        - v. -                    :    Violation of
                                  :    18 U.S.C. § 1349
ELDAR RAKHAMIMOV,                 :
NASIM RAKHAMIMOV,                 :    COUNTY OF OFFENSE:
VLADIMIR ZABRODIN,                :    NEW YORK
RUSLAN KADIROV, and               :
JOSEPH FINNERAN,                  :
                                  :
        Defendants.               :
                                  :
- - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

        AARON J. OTTERSON, being duly sworn, deposes and says
that he is a Special Agent with the Federal Bureau of
Investigation ("FBI"), and charges as follows:

COUNT ONE

        1.    From at least in or about September 2016, up to
and including in or about December 4, 2017, in the Southern
District of New York and elsewhere, ELDAR RAKHAMIMOV, NASIM
RAKHAMIMOV, VLADIMIR ZABRODIN, RUSLAN KADIROV, and JOSEPH
FINNERAN, the defendants, and others known and unknown,
knowingly and willfully did combine, conspire, confederate and
agree together and with each other to commit an offense against
the United States, to wit, to violate Title 18, United States
Code, Section 1341 and 1343.

        2.    It was also a part and an object of the
conspiracy that ELDAR RAKHAMIMOV, NASIM RAKHAMIMOV, VLADIMIR
ZABRODIN, RUSLAN KADIROV, and JOSEPH FINNERAN, the defendants,
and others known and unknown, having devised and intending to
devise a scheme and artifice to defraud, and for obtaining money

and property by means of false and fraudulent pretenses, representations, and promises, and attempting to do so, for the purpose of executing such scheme and artifice, and attempting to do so, would and did place in any post office and authorized depository for mail matter, matters and things to be sent and delivered by the Postal Service, and would and did deposit and cause to be deposited matters and things to be sent and delivered by private and commercial interstate carriers, and would and did take and receive therefrom such matters and things, and would and did knowingly cause to be delivered by mail and such carriers according to the direction thereon, and at the place at which it was directed to be delivered by the person to whom it was addressed, such matters and things, in violation of Title 18, United States Code, Section 1341, to wit, the defendants fraudulently inflated the volume of recyclable containers delivered to particular recycling facilities, thereby causing victim-bottling companies to overpay reimbursements and service fees to the defendants and others, some of which reimbursements and service fees were mailed to the defendants.

      3.    It was also a part and an object of the conspiracy that ELDAR RAKHAMIMOV, NASIM RAKHAMIMOV, VLADIMIR ZABRODIN, RUSLAN KADIROV, and JOSEPH FINNERAN, the defendants, and others known and unknown, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, and attempting to do so, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, the defendants fraudulently inflated the volume of recyclable containers delivered to particular recycling facilities, thereby causing victim-bottling companies to overpay reimbursements and service fees to the defendants and others, and, in doing so, arranged for the delivery of recyclable containers through, among other means, interstate telephone calls between New York and New Jersey.

         (Title 18, United States Code, Section 1349.)

2

4.     The bases for my knowledge and the foregoing charge are, in part, as follows:

5.     I am a Special Agent with FBI and have been personally involved in the investigation of this matter. This Affidavit is based upon my personal participation in the investigation, my examination of reports and records, and my conversations with other law enforcement agents and other individuals. Because this Affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## THE NEW YORK STATE RETURNABLE CONTAINER ACT

6.     From my review of publicly available information provided by the New York State Department of Taxation and Finance ("DTF") and the New York State Department of Environmental Conservation ("DEC"), I have learned, among other things, that:

a.     The State's Returnable Container Act (the "RCA"), codified at New York Environmental Conservation Law, Article 27, Title 10, was initially enacted in or about 1983 as a legislative response to litter, environmental damage, and related budgetary burdens associated with the production and disposal of beverage containers, such as bottles and cans. Since its initial enactment, the RCA has been amended at various times, including in 2009 and 2013, and currently includes a regulatory scheme designed to promote the recycling of bottles and cans by bottlers, beverage distributors, and container redemption centers.

b. Under the regulatory scheme established pursuant to the RCA, certain companies referred to as "deposit initiators" must collect a $.05 deposit on every container for certain specified beverages, including soft drinks, beer, and bottled water, sold in New York State. Deposit initiators are the first bottler, distributor, or dealer to collect the required deposits on beverage containers. Deposit initiators must, among other things, register as a deposit initiator with the State, establish a refund value account, track all deposits collected, and file quarterly reports with DTF.

3

c. "Refund value accounts" are bank accounts established by deposit initiators for the purpose of holding the deposits paid by consumers. The accounts are used to reimburse customers (or other companies, as described in more detail below) that redeem bottles to the deposit initiator for the purpose of recycling those bottles. At the end of each fiscal quarter, the deposit initiator must remit 80% of the balance of such refund value accounts (i.e., the amount remaining in those accounts after the reimbursement of deposits to redeeming persons or entities) to the DTF; the remaining 20% of the quarterly balance may be withdrawn by the deposit initiator for its own use (subject to certain restrictions not relevant to this Complaint).

d. In addition to the $.05 deposit that must be reimbursed to redeeming individuals or entities, deposit initiators must pay a handling fee of $.035 per empty beverage container redeemed by "redemption centers," which are defined as, among other things, "any person offering to pay the refund value of an empty beverage container to a redeemer [that is, a person demanding the refund value in exchange for an empty beverage container]." 6 N.Y.C.R.R. § 367.2(r); *see also* 6 N.Y.C.R.R. § 367.6 ("A distributor must pay to each dealer or redemption center a handling fee of not less than 20 percent of the refund value of each empty beverage container accepted from such dealer or redemption center. This handling fee must be paid in addition to the refund value of each such empty beverage container.").

INITIAL INVESTIGATION OF THE DEFENDANTS' FRAUDULENT SCHEME

7.    From my conversations with a confidential source working at the direction of the FBI ("CS-1"),[1] as well as my

---

[1] CS-1 initially approached law enforcement in or about 2016 regarding an attempt by another individual ("Individual-1") to extort CS-1 in connection with the repayment of debts from CS-1's gambling losses at an illegal gambling establishment. Subsequently, CS-1 cooperated with law enforcement by, among other things, obtaining consensually recorded conversations with Individual-1 and others, and by describing his knowledge of and prior participation in the offenses described herein. CS-1 is not receiving compensation for cooperation; rather, CS-1 is cooperating in the hope of receiving leniency with respect to his own criminal exposure. CS-1 has been corroborated by, among other things, information and recordings obtained through other confidential sources regarding the activities of Individual-1,

4

review of transcriptions of conversations between CS-1 and certain participants in the conspiracy charged herein, which were consensually recorded by CS-1 during in-person and telephonic conversations involving CS-1, I have learned, among other things, that:

a. Since in or about 2013, CS-1 has worked as a truck driver for a company ("Company-1") managed by ELDAR RAKHAMIMOV and NASIM RAKHAMIMOV, the defendants. Company-1 is based in Brooklyn, New York, and is a redemption center within the definition set forth above.[2] Company-1 collects recyclable beverage containers for redemption to various deposit initiators, including two particular bottling companies ("Depositor-1" and "Depositor-2"), whose beverage containers are each returned to the same redemption facility located in Queens, New York ("Facility-1"). Company-1 pays members of the public $.05 for each empty beverage container returned to Company-1, and subsequently compiles and delivers those empty containers to Depositor-1 and Depositor-2, among other deposit initiators, in return for reimbursement of the $.05 refund initially paid by Company-1 and a handling fee. CS-1's role at Company-1 has been to deliver empty bottles on behalf of Company-1 to Depositor-1 and Depositor-2 at Facility-1.

b. In order to defraud Depositor-1, Depositor-2, similarly situated depositors, and ultimately the State, ELDAR RAKHAMIMOV, NASIM RAKHAMIMOV, VLADIMIR ZABRODIN, and JOSEPH FINNERAN, the defendants, together with a co-conspirator working at Facility-1 ("CC-1"), among others, falsely overstate the number of empty beverage containers delivered by Company-1 to Facility-1. The false inflation of recycled containers results in an

---

as well as information and recordings obtained by CS-1 regarding the offenses described herein.

[2] Furthermore, I have learned from a review of bank records relating to various entities and "DBAs" controlled by ELDAR RAKHAMIMOV, among others, that ELDAR RAKHAMIMOV is listed as the President of a particular company ("Company-2"). From my review of open source information available on the internet, and from a report by law enforcement officers regarding an on-site visit, I have learned, among other things, that Company-2 is a Manhattan-based container collection point that collects containers from throughout the New York City area before Company-1 compiles those containers and others at its main warehouse. Bottles collected at Company-2, therefore, are used in part in the commission of the conspiracy described herein.

overpayment of bottle deposits and handling fees to Company-1.[3] CC-1, in turn, receives kickbacks in the form of cash payments from ELDAR RAKHAMIMOV and NASIM RAKHAMIMOV, delivered by CS-1.

c. CS-1, when picking up shipments of bottles from Company-1, has viewed invoices maintained principally by NASIM RAKHAMIMOV that reflect the actual volume of empty containers being delivered to Facility-1. After driving those containers to Facility-1, the bottles are off-loaded by CC-1, among others. CC-1 then provides a separate invoice to CS-1 reflecting a falsely inflated number of containers. CS-1 then returns to Company-1, provides the falsely inflated invoice to NASIM RAKHAMIMOV. NASIM RAKHAMIMOV then pays CS-1 in cash, with the amount paid depending on the extent of inflation reflected on the fraudulent invoice provided by CC-1. Typically, the degree of false inflation equates to approximately $1,000 per truckload in fraudulently inflated "redemptions" and handling fees to be paid to Company-1 by Depositor-1 and Depositor-2. Of that $1,000, NASIM RAKHAMIMOV allocates approximately $700 to himself, ELDAR RAKHAMIMOV, and CC-1, while $300 is allocated to CS-1.

d. During the course of this investigation, CS-1 has obtained photographs of writings produced by employees and contractors hired by Company-1 reflecting the actual number of empty containers delivered to Depositor-1 and Depositor-2, as well as photographs of the inflated invoices prepared by CC-1 and used by NASIM RAKHAMIMOV to calculate payments to CS-1, ELDAR RAKHAMIMOV, NASIM RAKHAMIMOV, and CC-1. For example:

i. On or about September 28, 2016, CS-1 photographed notes reflecting the actual number of empty

_____

[3] From my review of bank records relating to various limited liability corporations and other entities formed by CC-1, including Company-1, I have learned, among other things, that bank accounts controlled by ELDAR RAKHAMIMOV have received checks drawn on bank accounts belonging to Depositor-1 and Depositor-2, reflecting payments of service fees and reimbursements for Company-1's delivery of recyclable containers to Facility-1. As set forth in more detail above, these checks, drawn on the accounts of Depositor-1 and Depositor-2, represent moneys and funds under the custody or control of those depositor-victims' banks. From my review of bank records of Company-1, I have learned that these checks appear to have been sent from a bank branch in Maine to Company-1 in New York, through the mail.

containers delivered to Depositor-1 and Depositor-2 by CS-1 on that day, as well as the falsely inflated invoices provided by CC-1 for Depositor-1 and Depositor-2. For 12 ounce cans, the invoice provided by CC-1 included a reported delivery that was inflated by approximately 11% of the actual number of cans delivered to Facility-1 on that day.[4]

       ii.    On or about October 3, 2016, CS-1 photographed notes reflecting the actual number of empty containers delivered to Depositor-1 and Depositor-2 by CS-1 on that day, as well as the falsely inflated invoices provided by CC-1 for Depositor-1 and Depositor-2. For 12 ounce cans, the invoice provided by CC-1 included a reported delivery that was inflated by approximately 55% of the actual number of cans delivered to Facility-1 on that day.

       iii.    On or about October 5, 2016, CS-1 photographed notes reflecting the actual number of empty containers delivered to Depositor-1 and Depositor-2 by CS-1 on that day, as well as the falsely inflated invoices provided by CC-1 for Depositor-1 and Depositor-2. For 12 ounce cans, the invoice provided by CC-1 included a reported delivery that was inflated by approximately 57% of the actual number of cans delivered to Facility-1 on that day.

       e.    On or about October 3, 2016, CS-1 engaged in a recorded, in-person conversation with NASIM RAKHAMIMOV during which the following exchange ensued:[5]

NR:        . . . So, what you have you got, [CS-1]?

CS-1:    Nothing, three trucks and I added ten and ten on the first and the second.

NR:        Comes out twenty.

CS-1:    Yes.

NR:        I owe you a thousand.

---

[4] ELDAR RAKHAMIMOV, NASIM RAKHAMIMOV, and CC-1, among others, also engage in inflating the numbers of other empty containers, including 20 ounce bottles, 1 liter bottles, and 2 liter bottles. In this Complaint, I report only the inflation of 12 ounce cans on the particular days described.

[5] All excerpts are from draft translations of transcribed recordings.

CS-1:   1,080 plus 100; 1,180.

NR:     I'll give you the money, okay?

CS-1:   Black said he does not want to do anything while I am away. He does not know anybody.

NR:     He will know everybody, don't worry.

CS-1:   Frankly, on the one hand, I understand him. He doesn't know what and how.

NR:     All is alright.

CS-1:   Listen, if he tries, force him, I can't do anything.

NR:     He will go by himself and do, he himself said: "I will do it with you."

CS-1:   And to me he said he listened to him, "yes, yes, yes" and to me he said: "I work only with you." He said that "if you tell me that I need to do it so, then I will do it."

.  .  .

CS-1:   Good, listen, I don't know why Black said so, I told him that while I'm away he will drive, he says I don't want any fucker. He told me: "I don't want to do business with anybody."

.  .  .

NR:     Can you reach an agreement with him?

CS-1:   You know what I can tell him? He will do everything, I can give him some share, let's say, I will be away for a week, from Saturday to Sunday, in terms of work days I miss just one week; because I count it as if I worked on Friday in full.

NR:     You will go, you will calculate what and how [UI]. Yes, and in a week we will settle the account. Generally, this is the same thing that I did now. What's the difference? [UI]

```
CS-1:      The thing is he does not want to do it with
           someone new, I understand that. I will tell him
           that there isn't even anything to consider. A
           person will come, sign papers and go away, right?

NR:        Yes.
```

Based on my experience in this investigation, my conversations
with CS-1 following this exchange with NASIM RAKHAMIMOV, and my
participation in subsequent surveilled and/or recorded meetings
with CC-1, among others, I understand that, during this
conversation, NASIM RAKHAMIMOV inquired about the inflated
number of empty containers on two of three trucks driven by CS-1
on October 3, 2016 ("CS-1: Nothing, three trucks and I added ten
and ten on the first and the second. / NR: Comes out twenty.").
Thereafter, and based in part on this degree of inflation, NASIM
RAKHAMIMOV calculated a payment to CS-1 ("I owe you a
thousand."). Subsequently, CS-1 and NASIM RAKHAMIMOV discussed
CC-1, whom CS-1 and NASIM RAKHAMIMOV refer to as "Black," and
CC-1's reluctance to participate in this fraud with a driver
other than CS-1, who was planning a vacation ("I don't know why
Black said so, I told him that while I'm away he will drive, he
says I don't want any fucker. He told me: 'I don't want to do
business with anybody.'"). Specifically, CS-1 expected that
another driver working with ELDAR RAKHAMIMOV and NASIM
RAKHAMIMOV, RUSLAN KADIROV, the defendant, would "cover" CS-1's
deliveries to Facility-1 during CS-1's vacation, and that
KADIROV would continue the scam without speaking directly to CC-
1 about the fraud. NASIM RAKHAMIMOV agreed with that plan ("CS-
1: The thing is he [*i.e.*, CC-1] does not want to do it with
someone new [*i.e.*, KADIROV], I understand that. I will tell him
that there isn't even anything to consider. A person will come,
sign papers and go away, right? / NR: Yes.").

        f.    Since October 2016, CS-1 has continued to discuss
the recycling fraud with ELDAR RAKHAMIMOV, NASIM RAKHAMIMOV,
KADIROV, and CC-1, among others. For example:  On or about April
17, 2017, CS-1 engaged in a recorded in-person conversation with
KADIROV during which the following exchange ensued:

```
CS-1:      I just wanted to count. . . That's why… regarding
           our dealings. It turned out, in the fir— during
           the first week, there were 14 trucks? 360 each,
           right? No, 320 each.
```

   .  .  .

CS-1:      Uh-huh. It turns out the Black [*i.e.*, CC-1] one
           took 14 x $200, [*i.e.* $2,800].

KADIROV:   Uh-huh.

CS-1:      Minus what Nasim [*i.e.*, NASIM RAKHAMIMOV] took,
           uh, 14 x $20, $280. So minus $280, $1,400 left.
           Divide by two, equals $700.

KADIROV:   Uh-huh.

CS-1:      Okay?

KADIROV:   Did you take off $500?

CS-1:      Yes. [OV] 200 dollars more.

KADIROV:   [OV] You still owe $50. You still owe me $50.

CS-1:      [OV] Yes. Yes. Now—

KADIROV:   Twelve trucks.

CS-1:      Last week times $320—

KADIROV:   Minus…

CS-1:      Minus uh… $1,800 to the Black one, right?

KADIROV:   $1,800… minus…

CS-1:      $240 to Nasim, right?

KADIROV:   Uh-huh. Minus…

CS-1:      Divide by two. [Pause] Equals $900. Minus $500
           and minus $50. Minus $550… So it leaves $350.
           Right?

KADIROV:   $350 what?

CS-1:      What's owed to me. Because $1,800 was left after
           the Black one and after Nasim. Right?

KADIROV:   Minus… minus…

CS-1:      Twelve trucks $320 each equals $3,840 minus
           $1,800—

KADIROV:   [OV] Minus $100, minus… $500, minus $500 [UI],
           $400 [UI]

CS-1:      Huh?

KADIROV:   [UI] …see? Divide by two, minus $50 equals $350.

CS-1:      Right? Did he do everything today? Three trucks?

KADIROV:   Two.

CS-1:      Ah, only two?

KADIROV:   They are not taking three.

CS-1:      Oh, they didn't take the third one.

KADIROV:   There's no [UI], a lot of [bottles produced by
           Depositor-1].

.  .  .

KADIROV:   [UI] says, "Go, pay because… I don't want any
           problems with the Black one. Tomorrow [an
           unidentified individual] will come, tell him that
           we [UI]. I – okay, took $2,800 and gave it to
           them. Last time it was $1,800. And still he is
           telling me now, "You owe me for three more
           trucks." Six hundred dollars, like I owe $300 and
           you owe $300. Three-fifty is left.

CS-1:      Well, it's for each, it's my share. The $1,800
           that's left is the total.

KADIROV:   Okay, but—

CS-1:      Right?

KADIROV:   If I give $300 there, you'll have 50 dollars left
           there, right?

CS-1:      Yes.

KADIROV:    That's why you have to clarify it with the Black
            one—

CS-1:       Where he got this.

KADIROV:    Right.

CS-1:       Okay I'm gonna call now—

KADIROV:    [OV] [UI]

CS-1:       And how is he today? I'm curious what he wants
            for today. I'm gonna ask Nasim now. What it is
            today. I'm gonna ask Nasim.

Based on my experience in this investigation, my conversations
with CS-1 following this exchange with KADIROV, my review of
prior recorded conversations, and my participation in subsequent
surveilled and/or recorded meetings between CS-1 and
participants in this scheme, I understand that, during this
conversation, CS-1 and KADIROV discussed the distribution of
proceeds from the recycling scam orchestrated by ELDAR
RAKHAMIMOV, NASIM RAKHAMIMOV, and CC-1 (who is referred to as
"Black" or "the black one" by KADIROV and others in this
scheme). In particular, KADIROV and CS-1 discussed the amounts
of money being withheld or paid to NASIM RAKHAMIMOV and CC-1
("Because $1,800 was left after the Black one and after
Nasim."). KADIROV, moreover, makes reference to the volume of
deliveries subject to the fraudulent inflation and,
consequently, part of the tabulation of proceeds owed to NASIM
RAKHAMIMOV and CC-1 ("KADIROV: Twelve trucks. / CS-1: Last week
times $320— / KADIROV:  Minus… / CS-1: Minus uh… $1,800 to the
Black one, right? / KADIROV: $1,800… minus… / CS-1:   $240 to
Nasim, right? / KADIROV: Uh-huh. Minus…").

        g.    Also on or about April 17, 2017, CS-1 engaged in an
in-person recorded conversation with ELDAR RAKHAMIMOV, during
which the following exchange ensued:

CS-1:       [OV] It means that the Black one [*i.e.*, CC-1]
            wants more money and that's why he invented this
            fucking shit. But he got some gall, he gets more
            than I do. Especially since the Spanish are not
            there now. Maybe he's afraid that he's alone
            there, but it's all working smoothly and he gets
            his money every week. I've never taken any 300,
            400 or even 100 dollars from him. The only thing

```
                    is I tell him every time when he adds 2-3 less
                    than he's supposed to. I told him because it
                    piles up—

        ER:         [OV] Well, that's right.

        CS-1:       [OV] Within a day or a week it comes to a whole
                    truck. And that's it.

        ER:         [OV] Well, look, he's working now, the Black one.
                    He does everything he's supposed to.

        CS-1:       Yes.

        ER:         He has no problem. [OV] [UI]
```

Based on my experience in this investigation, my conversations with CS-1 following this exchange with ELDAR RAKHAMIMOV, my review of prior recorded conversations, including those set forth above, and my participation in subsequent surveilled and/or recorded meetings between CS-1 and ELDAR RAKHAMIMOV and others, I understand that, during this conversation, CS-1 and ELDAR RAKHAMIMOV discussed a desire by CC-1 to receive a greater percentage of the proceeds of the recycling scam ("It means that the Black one [*i.e.,* CC-1] wants more money. . . .") and ELDAR RAKHAMIMOV's recognition that CC-1 is a successful and contributing member of the conspiracy ("Well, look, he's working now, the Black one. He does everything he's supposed to. . . . He has no problem.").

        h.      On or about September 8, 2017, CS-1 engaged in a surveilled and recorded conversation with CC-1 during which time CS-1 provided CC-1 with funds from ELDAR RAKHAMIMOV and NASIM RAKHAMIMOV as a kickback for the recycling scheme that CC-1 facilitates at Facility-1. During that conversation, the following exchange ensued:

```
        CS-1:       Pay some bills, so I was going to ask you think
                    we go back to before go back to thirty, thirty
                    you think? So we can make a little extra.

        CC-1:       Hmm.

        CS-1:       Thirty, thirty, thirty cans thirty points.

        CC-1:       Nah, I tell you, they watching already. Can't
                    really go that way you know.
        . . .
```

CC-1:    You got to drop a little lower maybe like two you know.

CS-1:    Oh you mean drop it even more.

CC-1:    No you got to drop instead like you know like three you drop like two you know got to make it look like. . .

CS-1:    No but I think he knows I can always show him how stacked the warehouse is so we have stuff enough till next summer, because not right now because we bring in less than we have you know what I mean? Like I can bring four trucks worth of stuff every day maybe for at least a month that's already straight product that not counting the mix.

CC-1:    Asking for trailer and thing. . .

CS-1:    Yeah, Yeah they sent it to me once or twice.

CC-1:    I don't know when going to see how it goes.

CS-1:    I think we okay because…

CC-1:    No I said we going to see how it going to work out. [UI] that why sometimes ah, ah, ah I put like some bad cans and stuff for you. Because when you perfect like that.

CS-1:    The weight.

CC-1:    The weight can't be perfect all the time.

Based on my experience in this investigation, my conversations with CS-1 following this exchange with CC-1, my review of prior recorded conversations between and among CS-1, ELDAR RAKHAMIMOV, NASIM RAKHAMIMOV, and CC-1, I understand that, during this conversation, CS-1 proposed to CC-1 that CC-1 increase the degree of fraudulent inflation of recycled containers, but that CC-1 was hesitant to further increase the inflation for fear of discovery by others ("CS-1: . . . so I was going to ask you think we go back to before go back to thirty, thirty you think? So we can make a little extra. / CC-1:  Hmm. / CS-1:  Thirty, thirty, thirty cans thirty points. / CC-1:  Nah, I tell you,

they watching already. Can't really go that way you know."). CC-1 also described one means by which he falsely alters the accounting and inventorying of containers delivered by CS-1 so as to avoid scrutiny of CC-1's reports regarding the falsely inflated volume of such containers ("CC-1: . . . that why sometimes ah, ah, ah I put like some bad cans and stuff for you. Because when you perfect like that. / CS-1: The weight. / CC-1: The weight can't be perfect all the time.").

   i. On or about October 12, 2017, at approximately 10:38 a.m., CS-1 engaged in the following recorded telephone conversation with VLADIMIR ZABRODIN who was using a telephone assigned a particular call number (the "ZABRODIN Phone"):

VZ: Hello?

CS-1: Hello [UI], this is [CS-1] from [UI].

VZ: Oh, [CS-1]! Yes, I'm waiting for your call thinking why you are not calling me.

CS-1: Yes, I talked to this one, the Black one, he –

VZ: Uh-huh.

CS-1: He's kind of interested, but he says, "I want to work only through you [i.e., CS-1], yourself, work everything out."

VZ: Yes, yes, of course, of course. Let's – what and how, [CS-1].

CS-1: [UI] I don't know, let's – Would you like to meet after work and kind of discuss everything?

VZ: Well, we are going to discuss everything. So basically everything should be like with Eldar [i.e., ELDAR RAKHAMIMOV], kind of, the same numbers and everything else is going to be the same, I think.

. . .

CS-1: . . . . He goes there, load[s] it, then takes care of everything and I think the payment will be taken care of at the end of the week.

VZ:         I think we'll be getting together one in a week,
                    kind of [UI].

        . . .

        CS-1:       I want this to be just between you and me, so no
                    know from my side should know about that and no
                    one from your side should know about that,
                    either. I've mentioned to Nasim [*i.e.*, NASIM
                    RAKHAMIMOV] what and how over there. He [Nasim]
                    says, "all questions must be addressed to Eldar."
                    But I think if you go to Eldar, he would say,
                    "That's it."

        VZ:         No, Eldar knows. We've been talking about that
                    with him. Eldar is aware.

Based on my experience in this investigation, and on my
conversations with CS-1 regarding this call, as well as on my
review of other recorded conversations between CS-1 and other
participants in the fraudulent scheme described herein, I
understand that, during this conversation, ZABRODIN attempted to
finalize arrangements with CS-1 to use CC-1 ("the Black one") to
facilitate the recycling scam for a company managed by ZABRODIN.
Moreover, ZABRODIN wished to engage in the scam using the same
methods and distribution of proceeds as employed by Company-1,
and specifically by ELDAR RAKHAMIMOV ("Well, we are going to
discuss everything. So basically everything should be like with
Eldar, kind of, the same numbers and everything else is going to
be the same, I think."). CS-1 informed ZABRODIN that ZABRODIN
should not speak about the scam with others, but that CS-1 had
informed NASIM RAKHAMIMOV of ZABRODIN's wishes, and that NASIM
RAKHAMIMOV had referred CS-1 to ELDAR RAKHAMIMOV for any further
discussion about CS-1's involvement with ZABRODIN ("I've
mentioned to Nasim what and how over there. He [Nasim] says,
'all questions must be addressed to Eldar.'"). Although CS-1
believed that ELDAR RAKHAMIMOV would be reluctant to allow CS-1
to engage in the fraud for a competitor company, such as that
run by ZABRODIN ("But I think if you go to Eldar, he would say,
'That's it.'"), ZABRODIN attempted to allay CS-1's concerns by
stating that ZABRODIN and ELDAR RAKHAMIMOV had already discussed
ZABRODIN's plans ("No, Eldar knows. We've been talking about
that with him. Eldar is aware.").

        j.    On or about October 12, 2017, at approximately
12:55 p.m., following CS-1's conversation with ZABRODIN, as

described above, CS-1 engaged in the following recorded telephone conversation with ELDAR RAKHAMIMOV:

CS-1:       Everything is good. I've talked to [ZABRODIN] and found out that he asked for some help. So you said all right?

ER:         For what?

CS-1:       For [Depositor-1].

ER:         [ZABRODIN] is going fucking crazy a little bit. I didn't give any approval to no one. And he said, he doesn't fucking know what he's doing. [UI] I understand.

CS-1:       That's why –

ER:         [UI]

CS-1:       Yes, I wanted to find out if this is the truth or he invented it.

.  .  .

ER:         No, I, I'm not giving any [UI] for that because our trucks will be delayed. [UI].

CS-1:       No, no I don't – I, over there – what I was thinking that if [ZABRODIN] wants to do that [UI] he can do everything by himself, and the payments will be going down. I know that Black guy will not be willing to work with anybody, therefore we would have to give the Black one some money and that's it.

.  .  .

ER:         All right? He's fucking crazy. Because he does something very wrong [UI].

Based on my experience in this investigation, and on my conversations with CS-1 regarding this call, as well as on my review of other recorded conversations between CS-1 and other participants in this fraudulent scheme, I understand that, during this conversation, CS-1 informed ELDAR RAKHAMIMOV of ZABRODIN's desire to use CS-1 to deliver containers to Facility-

1 and CC-1 in furtherance of the recycling fraud. Although ELDAR RAKHAMIMOV acknowledged having spoken the ZABRODIN about the scam ("And he said, he doesn't fucking know what he's doing."), ELDAR RAKHAMIMOV denied having approved the use of his employee, CS-1, to assist ZABRODIN in conducting the fraud ("No, I, I'm not giving any [UI] for that because our trucks will be delayed.").

       k.    On or about October 12, 2017, at approximately 1:20 p.m., following CS-1's conversation with ELDAR RAKHAMIMOV, as described above, CS-1 engaged in the following recorded telephone conversation with ZABRODIN:

CS-1:      Listen, [ZABRODIN], I've been talking to Eldar. So he, kind of, he said that he doesn't know anything about work at all, and that he said, "I didn't say anything." [UI] everything is all right with you.

VZ:      Oh, he's never said that everything is all right with you?

CS-1:      Yes. I [UI].

VZ:      I will call him right now, right now. I'll talk to you him yes.

  .  .  .

CS-1:      . . . I don't know, do you want to talk to him about what he said to me that you [UI] and that you are too impudent, so it was to that effect. So, I, I didn't understand what he [UI]. Well, you said that you talked to him but the way you did answer to me that. . . .

VZ:      Ok, I'm going to, I'm going to see him today or tomorrow, so I am going to talk to him about that.

Based on my experience in this investigation, and on my conversations with CS-1 regarding this call, as well as on my review of other recorded conversations between CS-1 and other participants in this fraudulent scheme, I understand that, during this conversation, CS-1 informed ZABRODIN of ELDAR RAKHAMIMOV's rejection of the plan by ZABRODIN to use CS-1 as a driver for ZABRODIN insofar as that arrangement would deprive

ELDAR RAKHAMIMOV of the use of CS-1's manpower. ZABRODIN
expressed surprise at that reported reaction, arising from
ZABRODIN's purported prior conversations between ZABRODIN and
ELDAR RAKHAMIMOV, during which (as ZABRODIN had reported and as
set forth above) ZABRODIN and ELDAR RAKHAMIMOV had discussed
ZABRODIN's participation in the recycling scam. ZABRODIN
informed CS-1 that ZABRODIN would speak further and in person
with ELDAR RAKHAMIMOV about ELDAR RAKHAMIMOV's concerns ("Ok,
I'm going to, I'm going to see him today or tomorrow, so I am
going to talk to him about that.").[6]

      1.    On or about October 25, 2017, at approximately 7:27
p.m., CS-1 placed a recorded call to ELDAR RAKHAMIMOV and engaged
in the following conversation:

    CS-1:      OK, bro, of course. Listen, there is another
            question. [CC-1] called me. He's kind of starting
            to get brazen. He said that he wants more money.
            He's driving me fucking crazy.

    ER:       What's with him?

    CS-1:      I don't know. He said that--he said, "I'm taking
            a great risk," he said, "You-" he said,
            "different people—there's you," he said, "your
            assistant." I said, "So what's the matter? Don't
            you get paid everything, everything is like it's
            supposed to be. You are getting your salary every
            Friday." He said, [noise] "I am adding quite a
            lot. You are still paying me little." . . . .

    ER:       [OV] I don't understand. What does [UI] mean?

---

[6] Following this conversation, CS-1 and ZABRODIN have continued
to discuss ZABRODIN's participation in this fraud, including
through deliveries of recyclable containers to Facility-1. For
example, on or about November 6, 2017, CS-1 and ZABRODIN
discussed, in substance and in part, ZABRODIN's delivery of a
faulty shipment to CC-1, during which CS-1 relayed a message
from CC-1: "you [CS-1 on behalf of ZABRODIN] brought only 19 and
it cannot turn into 100," meaning that ZABRODIN's number of
bottles actually delivered was too low and could not be inflated
from approximately 20 to 100 (that is, a fraudulent inflation of
approximately 500%). Further, on or about November 16, 2017, on
a recorded call between CS-1 and ZABRODIN, ZABRODIN informed CS-
1, in substance and in part, that ZABRODIN had not yet
calculated the weekly kickback amount owed to CC-1.

CS-1:     [OV] I don't understand either.

ER:       [OV] He gets decent dough. Is he a fool or
          something?

CS-1:     [OV] Yes, he gets very decent dough, three a
          week.

ER:       [OV] So here it is.

CS-1:     [OV] I told him that he's getting two times more
          than I. He's been fucking adding 30/30 earlier
          and now he's adding kind of less, getting more
          for that, and--I don't know what's fucking
          happening with him. Maybe someone is fucking
          goading him on again, either Vova [i.e.,
          ZABRODIN], or someone else.

ER:       Well, I don't think so.

CS-1:     You don't think so?

ER:       [OV] [UI]

ER:       [OV] Ah, so—so, this has happened once, if you
          remember. He started bullshitting and then he was
          told, "You know what? If you don't want to do it—
          take a hike." And he stopped that.

CS-1:     Aha.

ER:       [OV] [UI]

CS-1:     This is also an alternative yes—I didn't even
          think about it.

ER:       [OV] We had that alternative before.

CS-1:     [OV] Yes.

ER:       [OV] Someone sucked the blood out of us and go to
          fuck yourself.

CS-1:     [OV] I told him, "What do you want?" I said, "You
          want money—add some bags." He said, "No." I say.

> ... He says that he just wants more money for the same bags. I said, "Well..."

ER:       [OV] No, no, no. Tell him, "It doesn't happen that way. It's not a first day we work with you, that's why nothing changes like that."

CS-1:   [OV] Okay, then when I'll get to work, I'll explain it to him.

ER:       Explain, just tell him, "Listen, it's not that simple. We work—it's not that simple," say, "We have to pay here and we have to pay there, we have to pay here and there [UI]."

Based on my experience in this investigation, and on my conversations with CS-1 regarding this call, as well as on my review of other recorded conversations between CS-1 and the participants in this fraudulent scheme, I understand that, during this conversation, CS-1 engaged ELDAR RAKHAMIMOV in a conversation about CC-1. Specifically, and at the direction of the FBI, CS-1 told ELDAR RAKHAMIMOV that CC-1 was demanding more money in the form of kickbacks for CC-1's role in the Target Offenses.[7] Among other things, CS-1 referred to ZABRODIN's dealings with CC-1 ("Maybe someone is fucking goading him on again, either Vova [i.e., ZABRODIN], or someone else."). ELDAR RAKHAMIMOV, moreover, referred to a previous incident in which CC-1 had made a similar demand for a higher kickback but was rebuffed by ELDAR RAKHAMIMOV ("[T]his has happened once, if you remember. He started bullshitting and then he was told, 'You know what? If you don't want to do it – take a hike.' And he stopped that.). Finally, ELDAR RAKHAMIMOV made reference to as-yet unidentified co-conspirators working at other initial depositors to whom ELDAR RAKHAMIMOV and Company-1 provide similar kickbacks ("Explain, just tell him, 'Listen, it's not that simple. We work—it's not that simple,' say, 'We have to pay here and we have to pay there, we have to pay here and there [UI].'").

       8.    From my conversations with CS-1, I have learned, among other things, that a particular truck driver ("Driver-1")

---

[7] In fact, CC-1 had not made such a demand; CS-1 made this claim at the direction of law enforcement in order to engage ELDAR RAKHAMIMOV in a conversation regarding the conspiracy described herein.

is a New Jersey-based driver for Company-1 who collects recyclable containers from collection points in Manhattan before delivering those containers to Company-1, before Company-1 then uses those containers in furtherance of the recycling scheme described above. From my review of toll information for a telephone belonging to ELDAR RAKHAMIMOV, the defendant, I have learned, among other things, that ELDAR RAKHAMIMOV is in telephone contact with Driver-1 via calls placed to a cellular telephone identified by service provider subscriber information as belonging to Driver-1. As described by CS-1, Driver-1 delivers bottles to Company-1 before CS-1 and others deliver those bottles to Depositor-1 and Depositor-2, among other initial depositors, thereby providing the materials necessary to successfully perpetrate the fraud.[8]

9.     I have further learned from conversations with CS-1 that, among other things, RUSLAN KADIROV, the defendant, has described KADIROV's engagement in the recycling scam by falsely inflating the reported number of empty containers delivered by KADIROV to another deposit initiator ("Depositor-3"). Bank records reviewed in the course of this investigation demonstrate that Depositor-3 has provided checks to various entities controlled by CC-1. With respect to Depositor-3, KADIROV has explained to CS-1, in substance and in part, that KADIROV delivers empty containers from Company-1 to Depositor-3, where an employee of Depositor-3 falsely inflates the number of redeemed containers and also leaves a certain amount of containers on KADIROV's truck, while reporting that those containers were in fact redeemed, thereby permitting KADIROV and his co-conspirators to "redeem" the remaining containers on multiple occasions.

## WIRETAP INVESTIGATION OF THE DEFENDANTS' FRAUDULENT SCHEME

10.     On or about November 6, 2017, the FBI began judicially authorized interceptions of wire communications over a particular cellular telephone used by ELDAR RAKHAMIMOV, the defendant, pursuant to an order dated November 3, 2017, and signed by the Honorable Paul G. Gardephe, United States District

---

[8] CS-1 does not know Driver-1 to be knowingly involved in the recycling fraud described herein. However, Driver-1 is included as a demonstration of probable cause to believe that the charged conspiracy includes the use of interstate telephone calls in furtherance of the charged conspiracy, namely the coordination of deliveries by CC-1 and Driver-1 for use by ELDAR RAKHAMIMOV in furtherance of the fraud.

Judge. Those interceptions have resulted in the recording of multiple communications regarding the charged conspiracy. For example:

a.    On or about November 7, 2017, at approximately 8:36 a.m., ELDAR RAKHAMIMOV placed a call to NASIM RAKHAMIMOV, the defendant. During that call, the following conversation occurred, in substance and in part:

ER:    G, don't forget that the one to be picked up in New Jersey needs to go to Misha right away, who [UI].

NR:    Yes, copy that.

ER:    And everything should be priced at 4 cents.

NR:    I know [IA].

ER:    [OV] All right.

NR:    [OV] I am going to, I am going to send Timur there right away.

ER:    All right, great.

Based on my training, experience, familiarity with the investigation, and understanding of New York's bottle recycling laws and regulations, I believe that this call reflects ELDAR RAKHAMIMOV and NASIM RAKHIMIMOV discussing a plan to pick up bottles in New Jersey and redeem them at facilities in New York. Specifically, ELDAR RAKHAMIMOV reminds NASIM RAKHAMIMOV about the need to pick up bottles in New Jersey ("G, don't forget that the one to be picked up in New Jersey needs to go to Misha right away.") and the price paid for them to the bottle-aggregator there ("And everything should be priced at 4 cents."). NASIM RAKHAMIMOV confirms ("I know") and promises to send one of their truck drivers ("I am going to send [a driver] there right away"). As New York provides redemption incentives only for bottles purchased in New York, picking up bottles in New Jersey (where there is no recycling redemption) and redeeming them in New York (as though they had been purchased in New York) defrauds both bottling-companies and, ultimately, New York State.

b.    On or about November 8, 2017, at approximately 8:56 a.m., ELDAR RAKHAMIMOV received a call from JOSEPH FINNERAN, the defendant. During that call, the following conversation ensued:

JF:    He had to straighten it out there was 50 bags of 20 oz. but we'll make it up during the week

23

ER:     50 bags of 20 oz.? Oh, Oh, you mean hold on...

JF:     Yeah, we changed the count the truck was 362, the
        truck now is 312. So, exactly what's on the page
        he had to cross out some that wasn't there. Uh,
        they were all looking.

ER:     Hold on, the truck should be right.

JF:     No, the truck was right.

ER:     All I'm doing — I'm just changing the 20's with
        the...

JF:     Correct, Correct. And that was something
        happened, guys that were standing there so as
        they were counting I guess they were counting 20
        oz. and it didn't come up right. So, he just
        fixed it that way and we'll fix it.

ER:     It's on one truck?

JF:     Yes, only one truck - everything else should be
        fine.

ER:     It should be 30 it shouldn't be 50 it should only
        be 30. Because what I'm doing, I'm changing 30
        bags on that and uh Okay, Okay, no problem
        whatever. Just do what you got to do.

JF:     Look at the sheet and I'll go back over it again.

ER:     No problem. Just do what you got to do, don't
        worry. Do what you got to do then we're going to
        straighten it up later, don't worry. Okay?

JF:     Everything is working good. He feels good with
        that, the way we're doing it.

ER:     Perfect, Perfect, Perfect.

JF:     Alright, alright.

ER:     Bye.

JF:     Bye.

Based on my training, experience, familiarity with the investigation, and review of related intercepted calls, I believe that this call reflects ELDAR RAKHAMIMOV discussing the manipulation of bottle counts intended to be submitted for payment. Specifically, FINNERAN informs ELDAR RAKHAMIMOV that one team had to reduce the claimed number of 20 ounce bottles ("we changed the count the truck was 362, the truck now is 312") because the inflation was obvious to others ("guys that were standing there so as they were counting I guess they were counting 20 oz. and it didn't come up right"). FINNERAN adds that it was only one truck ("only one truck—everything else should be fine"). ELDAR RAKHAMIMOV accepts the explanation ("Just do what you got to do, don't worry") and plans to make up the lost income later in the week ("we're going to straighten it up later, don't worry."). In addition, the call reflects one of ELDAR RAKHAMIMOV's fraudulent methods, describing a particular bag of bottles as bottles of one size when they are in fact bottles of a larger size ("I'm just changing the 20's with the..."). Based on my experience in this investigation, I understand that this practice acts to defraud companies that make recycling payments based on bag size—that is, approximating that bag of certain volume has a predicable number of bottles of a certain size—without counting the specific number of bottles in the bag.

      c. On or about November 10, 2017, at approximately 12:47 p.m., ELDAR RAKHAMIMOV placed an outgoing call to NASIM RAKHAMIMOV. During that call, the following conversation ensued:

NR:     Yes.

ER:     Listen, do you know J? You remember J, right?

NR:     Yes.

ER:     He is outside, sitting in his car. Go into the office without him noticing you. Count out $3720, $3720, count it, put it in an envelope. You know where the envelopes are.

NR:     Yes.

ER:     Take an envelope put it in the envelope glue it seal it and he doesn't need to understand that you know what is going on. [UI] He thinks that no one knows anything around here. So just go outside approach him and tell him that Eddy asked me to give that to you.

NR:     All right 3,700--

ER:     Twenty.

NR:     [UI]

ER:     All right?

NR:     Yes. Bye.

ER:     Go ahead. Do it now.


Based on my training, experience, familiarity with the investigation, and review of related intercepted calls, and conversations with CS-1, I believe that this call reflects ELDAR RAKHAMIMOV directing NASIM RAKHAMIMOV to pay a kickback to JOSEPH FINNERAN ("J"). Specifically, ELDAR RAKHAMIMOV asks NASIM RAKHAMIMOV if he recalls "J," informs NASIM that "J" is nearby ("He is outside, sitting in his car."), instructs NASIM RAKHAMIMOV to collect approximately $3,700 in a sealed envelope ("Count out $3720, $3720, count it, put it in an envelope.") and to give that money to "J" ("So just go outside approach him and tell him that Eddy asked me to give that to you."). Based on surveillance[9] and conversations with CS-1, I understand that "J" is FINNERAN, who works for a bottle redemption facility. Accordingly, in context, this call appears to capture ELDAR RAKHAMIMOV and NASIM RAKHAMIMOV arranging for a kickback payment to FINNERAN as employee of a redemption facility.

    11.    On or about November 24, 2017, during surveillance of Company-1 (as described in footnote 9, *supra*), I observed a bottle delivery truck that, based on the markings and writings on the exterior of the truck, I recognize as belonging to VLADIMIR ZABRODIN, the defendant, parked on the street in

_____

[9] On each of the two subsequent Fridays (November 17 and 24, 2017) ELDAR RAKHAMIMOV and/or NASIM RAKHAMIMOV was in communication with FINNERAN regarding payments by ELDAR RAKHAMIMOV and NASIM RAKHAMIMOV. For example, on or about November 17, 2017, ELDAR RAKHAMIMOV and FINNERAN engaged in a recorded conversation regarding a purported debt of approximately $600 owed by ELDAR RAKHAMIMOV to FINNERAN in connection with the recycling scheme. Further, on or about November 24, 2017, I observed NASIM RAKHAMIMOV at the offices of Company-1 provide a white envelope (consistent with ELDAR RAKHAMIMOV's instructions on November 10, 2017) to FINNERAN.

26

front of Company-1.

12. Based on conversations with CS-1, wire intercepts, a review of bank account records related to Company-1, ELDAR RAKHAMIMOV, and NASIM RAKHAMIMOV, the defendants, and the value and frequency of the kickbacks being paid to JOSEPH FINNERAN, the defendant, I believe that the defendants' fraud has resulted in more than approximately $300,000 in annual losses through Facility-1 alone, appears on track to cause similar losses at FINNERAN's facility, and has involved multiple additional facilities over a period of years.

WHEREFORE, deponent respectfully requests that ELDAR RAKHAMIMOV, NASIM RAKHAMIMOV, VLADIMIR ZABRODIN, RUSLAN KADIROV, and JOSEPH FINNERAN, the defendants, be imprisoned, or bailed, as the case may be.

_____

AARON J. OTTERSON
Special Agent, FBI

Sworn to before me this
5th day of December, 2017

_____

THE HONORABLE JAMES L. COTT
United States Magistrate Judge
Southern District of New York