IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**UNITED STATES OF AMERICA**

vs.                                                **CASE NO.: 18 CR 072-02/RA**

**NASIM RAKHAMIMOV, et. al.,**

       **Defendant.**

_____/

## SENTENCING SUBMISSION

*Introduction*

This letter is submitted pursuant to Rule 32(f) of the Federal Rules of Criminal Procedure and it sets forth Nasim Rakhamimov' sentencing recommendation. Nasim Rakhamimov requests that this court impose a sentence at variance with the Guidelines pursuant to the courts' authority under *United States v. Booker*, 534 U.S. 220 (2005) and 18 U.S.C. 3553(a).

In this case, the Presentence Investigation Report (P.S.R.) recommended a sentence which, if imposed, would result in Nasim Rakhamimov' imprisonment for 33 months. The conclusion reached by the P.S.R. is based heavily upon the monetary amount of loss that Mr. Rakhamimov' is being held accountable for, without any regard for other sentencing options available to the court. Nasim Rakhamimov objects to the imposition of a sentence based upon the guidelines for a significant reason: there are sufficient factors related to the history and characteristics of the defendant along with the nature and circumstances of the offense, which makes this case appropriate for the imposition of a non-guidelines sentence of probation. See, 18 U.S.C. 3553(a)(1).

Prior to the Supreme Courts' decision in *Booker*, an offender such as Nasim Rakhamimov, would have suffered severely from the mandatory application of the federal sentencing guidelines.  See, *United States v. Mishoe*, 241 F.3d 214, 220 (2nd Cir. 2001).  In the post-*Booker* era, however, this court has the authority to impose a non-guideline sentence pursuant to 18 U.S.C. 3553(a) where warranted, in cases such as this one.  See, *U. S. v. Gutierrez*, 555 F.3d 105, 109 (2nd Cir. 2009), *Kimbrough v. United States*, 522 U.S. 85 (2007).

## II.  Case Background/Guilty Plea

On January 29, 2018, a one count indictment was filed in the United States District Court for the Southern District of New York, charging Nasim Rakhamimov, and others, with violating mail and wire fraud in connection with violating the New York State Returnable Container Act.

Count One the indictment charged that, from, in or about, 2015 and including in or about December 4, 2017, Nasim Rakhamimov, along with others, conspired to execute a scheme and artifice to defraud bottling companies by falsely inflating the number of recyclable containers delivered to the recycling facilities in violation of 18 U.S.C. 1343.

On September 13, 2018, Nasim Rakhamimov pled guilty before the Honorable Ronnie Abrams to count one of indictment S2 18 CR 72/RA.

## III. Mr. Nasim Rakhamimov's Circumstances

Sometime in morning of December 5, 2017 law enforcement agents went to Nasim Rakhamimov's home in Brooklyn, NY with an arrest warrant for him.  Nasim Rakhamimov surrendered without incident.  While he was being transported to Manhattan, he could not help but wonder how, after all he had been through in his life, did he find himself in handcuffs in the back of a law enforcement vehicle heading to jail?

Nasim Rakhamimov was born on July 27, 1971 in Baku, Azerbaijan. He was born into a very tightknit family, twenty (20) days after his cousin and co-defendant, Eldar Rakhamimov. Their families lived literally doors from each other. His and Eldar's mothers were sisters who married two brothers, "two families merged together," as Mr. Rakhamimov puts it. And Nasim and Eldar have always been close, "like brothers."

In speaking about his childhood Mr. Rakhamimov explains, "I grew up in a household where my father worked hard and long hours in different warehouses as an office worker/laborer. My mother stayed home with us and they always made sure that me and my sister always had what we needed." I began working at the age of fifteen to help my parents and my sister. I would work at various odd jobs trying to make money.

Mr. Rakhamimov went on to further discuss his relationship with his cousin, Eldar Rakhamimov. "Our families are a very close-knit family. Growing up, Eldar was like an older brother to me. He was always looking out for me, and I for him. We did everything together. We attended the same day care, we were in the same schools, and attended college together. I always like to joke that we are so close because our mothers literally breast fed us side by side." In describing his early life, Mr. Rakhamimov spoke about the ethnic battles that rocked his country and eventually forced him to leave. "I was about 17 years old when the Nagorno-Karabakh conflict began again. People who had once shared meals together had become bitter enemies and it seemed to happen overnight."

The Nagorno-Karabakh war was an armed conflict that took place in the late 1980's to May 1994 between the majority ethnic Armenians of Nagorno backed by the Republic of Armenia, and the Republic of Azerbaijan. Inter-ethnic clashes broke out shortly after the

parliament of the Nagorno-Karabakh Autonomous Oblast in Azerbaijan voted to unify the region with Armenia.  A referendum, boycotted by the Azerbaijani population of Nagorno-Karabakh, was held, whereby most of the voters voted for independence.  The demand to unify with Armenia, which began anew in 1988, began peacefully.  As the dissolution of the Soviet Union neared, the tensions grew into an increasingly violent conflict between ethnic Armenians and ethnic Azerbaijan.  By the end of the war in 1994, as many as 230,000 Armenians from Azerbaijan and 800,000 Azerbaijanis from Armenia and Karabakh have been displaced as a result of the conflict, with Mr. Rakhamimov and his family counted among the displaced.[1]

Mr. Rakhamimov recalled a time when he was 19 years old and working in his cousins second hand clothing store.  "The buses would patrol the streets collecting young men for war.  Those of us, young men of age, would always have to be careful and always on alert in our surroundings because the soldiers would come in these buses at anytime and snatch people off the streets to go fight in the war.  One day the buses came, and they saw me working in the store.  They tried to force me onto the bus.  Eldar saw what was happening and he ran and gathered some of the elder men in the area and they were able to free me from the soldiers.  If it wasn't for my cousin, I would have been forced to fight in a war that I didn't want to fight in with no assurances of ever coming home.  That was the first time Eldar saved my life."

In recalling another incident Mr. Rakhamimov remembers 'his brother' saving his life for a second time.  "One day I was commuting home, I worked in the downtown area but lived in the suburbs and it was a long commute, when I was attacked by several Muslims.  I was on the bottom of the pile and they were beating me good when, somehow, Eldar was able to pull me

---

[1] Nagorno-Karabakh conflict, https: en.wikipedia.org/wiki/Nagorno-Karabakh_conflict

from the crowd and we were able to get away.  Soon after that I knew that I would have to leave Azerbaijan or eventually I would be forced to fight or killed for not wanting to."  Mr. Rakhamimov left Azerbaijan and fled to Russia.  While in Russia, he met and married his wife, Yuliya Rakhamimov and the two of them resided in Russia until they returned to Azerbaijan after the ceasefire was declared.  Mr. Rakhamimov and his family left Azerbaijan in 2006, joining his cousin Eldar and his family here in America.

Mr. Rakhamimov is a respected and generous member of his community.  Mr. Anar Garibov wrote a letter on Mr. Rakhamimov's behalf.[2]  In it, he writes about Mr. Rakhamimov being a "decent hardworking, trustworthy and caring person.  I know him as a family man, who cares great deal about his wife, loves his kids, respects his parents."

In the letter written by his wife, Yuliya Rakhamimov, she talks about her husband as "a great son, brother, father, husband and friend who always there for everybody."  She goes on to further talk about how caring and helpful he has always been to his parents, who they currently care for together, and about his generosity to others.  "He also has great empathy for others, he becomes very emotional when it comes to people who struggle with lack of money or health issues…. He helps people without even knowing them, he has helped some of my patients who could not afford to buy medicine.  That is how Nasim is."[3]

Both of Mr. Rakhamimov's children have written letters on his behalf and both show and describe the love that they have for their father.  In the letter from his son, Mikhail Rakhamimov, he talks about his father being a warm hearted and sweet person.  He also talks about how hard his father works in order to make sure that his family is taken care of and how Mikhail can't wait

---

[2] Letters included as Exhibits

5

to start working so he can help his father out and give him a chance to have more time for himself.  In the letter from his daughter, Sheila Rakhamimov, she writes about her funny father who shows his love for her every chance he gets.  She writes about how his encouragement in her schooling propels her to do well and because of him she is an honor student in her class.

*Application of § 3553(a)*

It is "the stated purpose of sentencing, that the sentence be sufficient, but not greater than necessary, to comply with the purposes of section 3553(a)(2).  For Mr. Rakhamimov this commandment justifies a sentence of probation, a sentence significantly less than the range suggested by the PSR of 33 – 41 months, with a recommendation of a sentence of 33 months incarceration.

Of the goals set out in 18 U.S.C. § 3553(a)(2), the Court should consider carefully the need for the sentence to "reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense;" "to afford adequate deterrence to criminal conduct;" "to protect the public from further crimes of the defendant;" and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(2).  Excessively long sentences, however, fail to reflect the seriousness of the offense, undermine respect for the law, and fail to provide just punishment.

In *U. S. v. Williams*, 481 F. Supp.2d 1298, 1304 (M.D. Fla. 2007) the District Judge, Judge Presnell, recognized that the 262 to 327 months' sentence called for by the career offender guidelines in that case "would not provide just punishment."  He went on to say that such a sentence "offends the very notion of justice."  In considering deterrence, Judge Presnell, echoing

---

[3] Letter included in exhibits

the proportionality concern of others, stated that "it seems appropriate to consider the deterrence factor in light of the seriousness of the offense, the deterrent effect of a harsh sentence should be reserved for those serious crimes where society's need for protection is the greatest." *Id.* at 1304.

Mr. Rakhamimov is aware that he is not facing sentencing under the career offender guidelines and not facing a sentence the length that Mr. Williams faced. And in urging this consideration by the Court, Mr. Rakhamimov does not intend to minimize the nature of the instant offense or his participation in the offense. Nonetheless, Mr. Rakhamimov urges this Court, while considering deterrence, to also consider the fact that consideration must also be given to the concept of proportionality.

The Court in *U.S. v. Ennis*, 468 F.Supp.2d 228 (D.MA 2006) pointed out the importance of proportionality:

> "The introduction to the guidelines notes that a primary purpose of the guidelines, and indeed, a significant purpose of all sentencing, is not just to avoid disparity in the sentencing of offenders, but also to ensure "proportionality in sentencing through a system that imposes appropriately different sentences for criminal conduct of different severity." U.S.S.G. § 1A1.1, Introductory cmt. (n.3). The drafters could have avoided disparity by sentencing all offenders to life imprisonment no matter what they did. But while that would have made sentencing uniform across the country, it would have been uniformly disproportionate, not to mention grotesquely unfair. In the instant case, Nicholson [who is a career offender] is facing 20 years for drug distribution, a sentence which matches the maximum punishment for the following offenses: sexual abuse, 18 U.S.C. § 2242; sexual exploitation of children, 18 U.S.C. § 2251; enticement into slavery, 18 U.S.C. § 1583; terrorism, 18 U.S.C. § 2322; torture, 18 U.S.C. § 2340A; kidnapping, 18 U.S.C. § 1201; seditious conspiracy, 18 U.S.C. § 2384; and, biological weapons, 18 U.S.C. § 175c. Likewise, under the guidelines, selling someone in the slave trade is "only" an offense level 22, U.S.S.G. § 2H4.1 and transmitting top secret national defense information is "just" a 29, U.S.S.G. § 2M3.3, while Nicholson's base offense level is 34. *Ennis*, 468 F.Supp.2d at 236.

Mr. Rakhamimov, with a total offense level of 20, has expressed remorse for his actions and when looking back at all that has happened, wishes he could turn back the hands of time. He believes that a sentence of probation would be sufficient to satisfy the courts need to provide just punishment, afford adequate deterrence, and the protection of the public.

   1. *The effects of incarceration on Mr. Rakhamimov's family*

The Hon. Patricia M. Wald is a retired judge for the United States Court of Appeals for the District of Columbia who received the Medal of Freedom from President Obama.[4] In 1995, when she was still on the bench, she wrote an article that appeared in the Federal Sentencing Reporter. She concluded the article with a paragraph critical of what was, then, the limited consideration permitted by the Sentencing Commission of the importance of parenting:

> The perennial law and order debate that goes on nationally focuses on the rights of society first as the individual offender to justify higher sentences, abolition of parole and even the death penalty. That same concern for society militates towards a sentencing policy that attempts in a small subset of first offender, non-violent parent prisoner cases to consider the welfare of the children. Neither Congress nor the Sentencing Commission has yet come forth with a convincing rationale why parenting should not be a legitimate consideration in the sentencing of low-risk offenders. It is ironic for a society whose leaders talk endlessly of family values to categorically deny the safe harbor of a parent to some of its most needy children.

Patricia M. Wald, "*What About the Kids?*": *Parenting Issues in Sentencing*, 8 Fed. Sent. 137, 139 (Nov./Dec. 1995).

Now that the Guidelines are no longer mandatory, courts have been willing to heed Judge Wald's call to fashion sentences that take into account the defendant's role as a parent. *See, e.g., U. S. v. DiMattina*, 885 F.Supp.2d 572, 582 (E.D.N.Y. 2012) (where the court considered, among

---

[4]There is a brief biography and mention of the award of the Medal of Freedom available at the White House web page at:

other factors, that "DiMattina's family will suffer emotionally and financially from his absence during his long incarceration."); *U. S. v. Rose*, 722 F.Supp.2d 1286, 1290 (M.D. Ala. 2010) ("Therefore, the court granted Rose a three-level departure based on loss of caretaking."); *U. S. v. Concepcion*, 795 F. Supp. 1262 (E.D.N.Y. 1992); *U.S. v. Rigo*, 2015 U.S. Dist. LEXIS 62239 (S.D.N.Y. 2015) (where the court considered, among other factors, defendant's age, health, and family situation); *U.S. v. Gerard*, 782 F.Supp. 913 (S.D.N.Y. 1992) (downward departure would be considered where defendant was the sole care giver of two teenage children); *U.S. v. Johnson*, 964 F.2d 124 (2nd Cir. 1992) (downward departure approved for defendant upon whom infant and three young children depend); *U.S. v. Joyner*, 924 F.2d 454, 459-61 (2nd Cir. 1991)(departure affirmed where imprisonment of defendant "might result in the destruction of an otherwise strong family unit").

The assistance Mr. Rakhamimov provides to his family is essential and they would suffer significantly if he was incarcerated. The support he provides is much more than financial. The emotional support he provides his teenage son and daughter, his ailing parents, and his wife and extended family, and the loss of that support, is deserving of consideration in the sentence this Court imposes.

## 2. Age and Criminal History

Another factor Mr. Rakhamimov ask this Court to consider is his age and the fact that this is his first contact with the criminal justice system, facts which he believes provides the Court with some assurance that a period of incarceration is not necessary to satisfy the 3553(a) focus of protecting the public from future crimes of the defendant. *See*, United States Sentencing

---

http://www.whitehouse.gov/the-press-office/2013/08/08/president-obama-names-presidential-

9

Commission, *Recidivism: Criminal History Computation of the Federal Sentencing Guidelines* (2004), Ex. 9 (which shows that those in the age group of 41 to 50 who fall in criminal history category I have an especially low recidivism rate of 6.9%, as compared to those, for example, in the 36 to 40 years of age bracket who recidivate at a rate of 12.1% and those under age 21 who recidivate at a rate of 29.5%)[5]; United States v. Carmona-Rodriguez, 2005 WL 840464, *5 (S.D.N.Y. 2005) (observing that those defendants "over the age of 40 . . . exhibit markedly lower rates of recidivism in comparison to younger defendants."). Additional research performed by the United States Sentencing Commission also shows that those like Mr. Rakhamimov who have no arrests have an even lower rate of recidivism than those individuals in criminal history category I who have an arrest history and are "the most empirically identifiable group of federal offenders who are least likely to offend." United States Sentencing Commission, *Recidivism and the "First Offender"*, May 2004 17.[6]

This Court' obligation under 18 U.S.C. § 3553(a)(2) to consider carefully, the need for his sentence to "reflect the seriousness of the offense; to promote respect for the law; to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and also "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, is an obligation that is imposed by law. 18 U.S.C. § 3553(a)(2). Excessively long

---

medal-freedom-recipients
  [5]The Sentencing Commission's report, including Exhibit 9, can be found at: http://www.ussc.gov/Research_and_Statistics/Research_Publications/2004/200405_Recidivism_Criminal_History.pdf.
  [6]The Report is available at:

sentences, however, fail to reflect the seriousness of the offense, undermine respect for the law, and fail to provide just punishment. *See U.S. v. Carr*, 792 F.Supp.2d 343, 516 (E.D.N.Y. 2011) ("A sentence must be proportional to the defendant's crime. A sentence that is disproportionately long in relation to the offense is unjust and fails to promote respect for the law. There is no reason to believe that respect for the law will increase if a defendant who deserves leniency is sentenced harshly any more than there is reason to believe that respect for the law will increase if a defendant who deserves a harsh punishment receives a slap on the wrist.").

Furthermore, given the fact that Mr. Rakhamimov has never had any contact with the criminal justice system, has a very strong support system, and compared with the nearly 3-year minimum sentence authorized under the guidelines for this offense, a lesser sentence in Mr. Rakhamimov' case would be in accordance with Second Circuit precedent. *See Mishoe*, 241 F.3d at 220:

> Obviously, a major reason for imposing an especially long sentence upon those who have committed prior offenses is to achieve a deterrent effect that the prior punishments failed to achieve. That reason requires an appropriate relationship between the sentence for the current offense and the sentences, particularly the times served, for the prior offenses. If, for example, a defendant twice served five or six years and thereafter committed another serious offense, a current sentence might not have an adequate deterrent effect unless it was substantial, perhaps fifteen or twenty years.

*See also*, *U. S. v. Oliveras*, 2010 WL 46872 (2nd Cir. Jan. 8, 2010); *U. S. v. Hodges*, 2009 WL 366231 (E.D.N.Y. Feb. 12, 2009).

---

http://www.ussc.gov/Research_and_Statistics/Research_Publications/2004/200405_Recidivism_First_Offender.pdf

### 2. Mr. Rakhamimov's history in considering his sentence

Mr. Rakhamimov's history is included in his "history and characteristics," part of the statutorily required consideration in the sentencing determination. 18 U.S.C. § 3553(a)(1). Similarly, his role within the offense is part of "the nature and circumstances of the offense," the other part of the statutorily required consideration. There was a time, of course, when district courts were limited in their ability to rely upon circumstances such as age and 'off the book' employment history in arriving at a sentence. That, though, is no longer the case, and sentencing courts are required to consider such factors:

> The Commission has not developed any standards or recommendations that affect sentencing ranges for many individual characteristics. Matters such as age, education, mental or emotional condition, medical condition (including drug or alcohol addiction), employment history, lack of guidance as a youth, family ties, or military, civic, charitable, or public service are not ordinarily considered under the Guidelines. See United States Sentencing Commission, Guidelines Manual 5H1.1-6, 11, and 12 (Nov. 2006). n3. These are, however, matters that § 3553(a) authorizes the sentencing judge to consider. *See, e.g.*, 18 U.S.C. § 3553(a)(1).

*Rita v. United States*, 551 U.S. 338, 364-365 (2007) (Stevens, J. concurring). *See also U. S. v. Bannister*, 786 F.Supp.2d 617 (E.D.N.Y. 2011) and *U.S. v. Jarvi*, 537 F.3d 1256, 1263 (10th Cir. 2008) ("We have now held that district courts have broad discretion to consider individual characteristics like age, employment, and criminal history in fashioning an appropriate sentence under 18 U.S.C. § 3553(a), even when disfavored under the Guidelines or already accounted for in another part of the calculation").

This Court, in arriving at the sentencing decision in this case, must, of course, consult the United States Sentencing Guidelines as the starting point in any sentencing determination. *See*

*U. S. v. Dorvee*, 3023799 WL (2nd Cir. Aug. 4, 2010); *U. S. v. Marrero*, 325 F.Supp.2d 453, 456 (S.D.N.Y. 2004). Nonetheless, courts must also consider the other factors set out in § 3553(a). Indeed, in some instances, the guidelines may have little persuasive force in light of some of the other § 3553(a) factors:

> Although "judges must still consider the sentencing range contained in the Guidelines, . . . that range is now nothing more than a suggestion that may or may not be persuasive . . . when weighed against the numerous other considerations listed in [§ 3553(a)]. " *Id*. at 787 (Stevens, J., dissenting). Indeed, as one district judge has already observed;
>
>> the remedial majority in Booker direct[s] courts to consider all of the § 3553(a) factors, many of which the guidelines either reject or ignore. For example, under § 3553(a)(1) a sentencing court must consider the "history and characteristics of the defendant." But under the guidelines, courts are generally forbidden to consider the defendant's age, his education and vocational skills, his mental and emotional condition, his physical condition including drug or alcohol dependence, his employment record, his family ties and responsibilities, his socio-economic status, his civic and military contributions, and his lack of guidance as a youth. The guidelines' prohibition of considering these factors cannot be squared with the § 3553(a)(1) requirement that the court evaluates the "history and characteristics" of the defendant.

*U. S. v. Ranum*, 353 F. Supp. 2d 984, 986 (E.D.Wis.2005) (citations omitted).

Thus, mitigating circumstances and substantive policy arguments that were formerly irrelevant in all, but the most unusual cases are now potentially relevant in every case. *U. S. v. Crosby*, 397 F.3d 103, 113 (2nd Cir. 2005). *See also*, *U. S. v. Johnson*, 567 F.3d 40, 47 (2nd Cir. 2009) ("post-Booker, the Sentencing Reform Act (SRA) requires the sentencing court to regard the guidelines' ranges as one of the many factors to consider in determining the sentence").

Courts have recognized that employment history is a valid justification for a below-guideline sentence. *See*, *Kimbrough v. United States*, 552 U.S. 85, 110 (2007) ("second, the [district] court considered Kimbrough's 'history and characteristics.' § 3553(a)1) . . . [noting] that Kimbrough has no prior felony convictions, that he had served in combat during Operation Desert Storm and received an honorable discharge from the Marine Corps and that he had a *steady history of employment"*) (emphasis added). Mr. Rakhamimov's employment history is included in his "history and characteristics," part of the statutorily required sentencing determination. 18 U.S.C. § 3553(a)(1).

In *U.S. v. K*, 160 F.Supp.2d 421, 441 (E.D.N.Y. 2001), the District Court, in quoting the Second Circuit in *U.S. v. Core*, 125 F.3d 74, 74-75 (2nd Cir. 1997), superseded by rule on other grounds as stated in *Quesada-Mosquera v. United States*, 243 F.3d 685 (2nd Cir. 2001) held that "Power to depart may be based upon significant pre-sentence rehabilitation via drug treatment, incarceration, assumption of familial, work, or education responsibilities…and the probability of continuing steps towards permanent good behavior. See also, *U.S. v. Williams*, 65 F.3d 301, 306 (2nd Cir. 1995) (affirming facilitation of rehabilitation as basis for downward departure).

Similarly, Mr. Rakhamimov's role and involvement in the instant offenses also bears relevance to the appropriate sentence to be imposed. While the recycling fraud conspiracy lasted for over a year, it is noteworthy that Mr. Rakhamimov's was not the mastermind of this scheme, did not recruit people to be involved in the scheme, and did not profit substantially form the scheme. While Mr. Rakhamimov may not be entitled to a mitigating role adjustment, the duration and the extent of his involvement is deemed relevant to the nature of the offense, the

penalty that will provide just punishment, and the need to provide unwarranted sentencing disparities. See, *U.S. v. Behr*, 2006 U.S. Dist. Lexis 38349, *11-12 (S.D.N.Y. June 8, 2006).

Mr. Rakhamimov believes that the recommended guideline sentence of 33-41 months set forth in his pre-sentence report by the probation department falls short of "the need to avoid unwarranted sentence disparities among defendants who have been found guilty of similar conduct or provide a just punishment." 18 U.S.C. § 3553(a)(6).

*3. Role of the Advisory Sentencing Guidelines*

As recognized in *U. S. v. Capanelli*, 479 F.3d 163, 165 (2nd Cir. 2007) the Second Circuit resolved a continuing debate among the circuits' as to how much weight should be given to one of the listed factors, the Sentencing Guidelines. In the decision in *Capanelli*, the court rejected "any across-the-board prescription regarding the appropriate deference to give the guidelines." *Capanelli*, 459 F.3d at 1184.

Rather, "…The recommended guideline range "*should* serve as 'a benchmark or a point of reference or departure'" for a sentencing court. *U. S. v. Fernandez,* 443 F.3d 19, 28 (2nd Cir. 2006), *cert. denied* 549 U.S. 882, 127 S.Ct. 192, 166 L.Ed.2d 143 (2006) (emphasis added) (quoting *U. S. v. Rubenstein,* 403 F.3d 93, 98-99 (2nd Cir. 2005), *cert. denied* 546 U.S. 876, 126 S.Ct. 388, 163 L.Ed.2d 173 (2005)). "While a district court must consider each § 3553(a) factor in imposing a sentence, the weight given to any single factor "is a matter firmly committed to the discretion of the sentencing judge and is beyond our review." *Id.* at 32.

Then, too, a sentence imposed outside of the Guidelines' scheme does not require extraordinary circumstances:

> "Before *Booker*, we recognized that district courts were required to sentence within the guideline range except in unusual cases, *U. S. v. Johnson*, 347 F.3d

> 635, 640 (7th Cir. 2003), and anything but a loose comparison to pre-Booker departure cases would vitiate the post-Booker discretion that sentencing courts enjoy.  All that is necessary now to sustain a sentence above the guideline range is "an adequate statement of the judge's reasons, consistent with section 3553(a), for thinking the sentence that he has selected is indeed appropriate for the particular defendant. *Dean*, 414 F.3d at 729."

*U. S. v. Castro-Juarez*, 425 F.3d 430, 436 (7th Cir. 2005).

Mr. Rakhamimov believes that the guideline sentence set forth in his pre-sentence report by the probation department falls short of "the need to avoid unwarranted sentence disparities among defendants. . . who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).  The fact is that the Guidelines, while proclaiming the goal of uniformity, sometimes fails to accomplish that goal when the sentence is based primarily on drug quantity. The Constitution Project recognized as much.[7]  The Project's Sentencing Initiative report concludes that the Sentencing Guidelines "place excessive emphasis on quantifiable factors such as monetary loss and drug quantity, and not enough emphasis on other considerations such as the defendant's role in the criminal conduct."[8]

"Since *Booker*, [however], the Guidelines are no longer a straight-jacket binding courts to artificially created and cruel paradoxes of sentencing. . ." *U. S. v. Hawkins*, 380 F. Supp. 2d 143, 161 (E.D.N.Y. 2005); *U.S. v. Davis*, 2008 U.S. Dist. LEXIS 44030 (S.D.N.Y., June 5, 2008); *U.S. v. Collado*, 2008 U.S. Dist. LEXIS 44010 (S.D.N.Y., June 5, 2008).

---

[7] It is a group which describes itself as "a bipartisan nonprofit organization that seeks consensus on controversial legal and constitutional issues thorough a unique combination of scholarship and activism," www.constitutionproject.org/index.cfm,   Its Sentencing Initiative Project includes such preeminent conservative jurists as United States Supreme Court nominee Samuel Alito and United States District Court Judge Paul Cassel, author of the decision in United States v. Wilson, 350 F.Supp.2d 910 (D. Utah 2005).

[8] http://www.constitutionproject.org/article.cfm?messageID=101.

*Conclusion*

As stated above, Nasim Rakhamimov objects to the recommended PSR sentence of 33 months. In this case, the guideline sentencing range of 33 to 41 months precludes the consideration of any of the other relevant sentencing factors set forth in 18 U.S.C. 3553(a), which is contrary to the need for individualized sentencing in the *post*-Booker era. The sentence recommended by the P.S.R. fails to give any consideration for the nature and circumstances of the offense and it also fails to take into account the defendants' history and background, both contrary to 18 U.S.C. 3553(a)(1).

The above factors are essential traditional factors which are relevant to arriving at a sentence which affords adequate deterrence and to provide the defendant with needed rehabilitative or other treatment, as required by 18 U.S.C. 3553(a)(2). Were this court to follow the recommendation of the P.S.R. and apply the guideline sentencing range, these traditional factors, and the sentencing concerns of 18 U.S.C. 3553(a)(1) & (a)(2) will be precluded from consideration in this case. In view of the interplay between the presence of highly relevant sentencing considerations present in this case, including the defendant' pre-arrest rehabilitation and the rigid application of the guidelines, Nasim Rakhamimov urges this court to impose a non-guidelines sentence.

Nasim Rakhamimov contends that the individualized consideration of all the relevant factors under 18 U.S.C. 3553(a), along with the Congressional goals for deterrence, is the proper approach in this case and warrants a sentence *significantly* less than 33 to 41 months incarceration recommended by the P.S.R. Mr. Rakhamimov requests that the court reach this goal by imposing a non-Guidelines sentence. Sentencing courts are, of course, charged with the

responsibility of treating those that come before them as individuals. *See Koon v. United States*, 518 U.S. 81, 113 (1996) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."). Courts are charged by Congress, as well, to impose a sentence that is sufficient, but not greater than necessary to fulfill the goals of sentencing established by Congress. *See* 18 U.S.C. § 3553(a).

    Mr. Rakhamimov believes that a sentence of probation is a sentence that is sufficient, but not greater than necessary to fulfill the goals of sentencing in this matter.

    Respectfully Submitted,

    Kafahni Nkrumah, Esq.          ,
    KAFAHNI NKRUMAH, Esq.
    Counsel for Mr. Rakhamimov

    Nkrumah Law PLLC
    20 Vesey St., ste. 400
    New York, New York 10007
    (718) 496-8744(o)
    kankruamahesq@aol.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by electronic delivery to Andrew Adams, Assistant U.S. Attorney, One St. Andrews Place, New York, NY 10007, this February 6, 2019.

 Kafahni Nkrumah, Esq.        ,
KAFAHNI NKRUMAH, Esq.
Counsel for Mr. Rakhamimov

Nkrumah Law PLLC
20 Vesey St., ste. 400
New York, New York 10007
(718) 496-8744(o)
kankruamahesq@aol.com